**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA**

**Roanoke Division**

**LIAM J. RUPKEY,**

                              **Plaintiff,**

**v.**

**VIRGINIA POLYTECHNIC INSTITUTE
AND STATE UNIVERSITY,**

          Serve:  c/o Ms. Kay Heidbreder
                    University Legal Counsel
                    237 Burrus Hall (0121)
                    Blacksburg, Virginia 24061

**VIRGINIA TECH CORPS OF CADETS,**

          Serve:  c/o MG Randal D. Fullhart
                    141 Lane Hall (0213)
                    280 Alumni Mall
                    Blacksburg, Virginia 24061

**TIMOTHY SANDS, PH.D., both individually
and in his official capacity as President of
Virginia Polytechnic Institute and State
University,**

          Serve:  314 Burrus Hall (0169)
                    Blacksburg, Virginia 24061

**FRANK SHUSHOK, JUNIOR, PH.D, both
individually and in his official capacity as Vice
President for Student Affairs of Virginia
Polytechnic Institute and State University,**

          Serve:  112 Burruss Hall (0250)
                    Blacksburg, Virginia 24061

**FRANCES B. KEENE, PH.D, both individually
and in her official capacity as Assistant Vice
President for Student Affairs of Virginia
Polytechnic Institute and State University,**

          Serve:  112 Burrus Hall (0250)
                    Blacksburg, Virginia 24061

**Civil Action No:**  7:20cv394

**JURY TRIAL DEMAND**

**STEVE SCHUH, both individually and in his official capacity as Assistant Director of Student Conduct of Virginia Polytechnic Institute and State University,**

  Serve: 141 New Hall West (0428)
      Blacksburg, Virginia 24061

**MAJOR GENERAL RANDAL D. FULLHART, both individually and in his official capacity as Commandant of the Virginia Tech Corps of Cadets,**

  Serve: 141 Lane Hall (0213)
      280 Alumni Mall
      Blacksburg, Virginia 24061

**COL CRAIG ALIA, both individually and in his official capacity as Deputy Commandant, 1st Battalion, Virginia Tech Corps of Cadets,**

  Serve: 141 Lane Hall (0213)
      280 Alumni Mall
      Blacksburg, Virginia 24061

**LIEUTENANT COLONEL DONALD G. RUSSELL, both individually and in his official capacity as Deputy Commandant, 2nd Battalion, Virginia Tech Corps of Cadets,**

  Serve: 141 Lane Hall (0213)
      280 Alumni Mall
      Blacksburg, Virginia 24061

       **Defendants.**

## <u>COMPLAINT</u>

  **THIS DAY CAME** Cadet Liam J. Rupkey, through counsel, to respectfully bring his Complaint against the Virginia Polytechnic Institute and State University, *et al.*

  Regarding the said Complaint, Cadet Rupkey offered the following:

**THE PARTIES**

1. Cadet Liam J. Rupkey (hereinafter referred to as "the plaintiff" or "Cadet Rupkey") is and was, at all times relevant to this Complaint, a natural person, a citizen of the United States, and a resident of the Commonwealth of Virginia.  Throughout the course of events described herein, he was a student at Virginia Polytechnic Institute and State University and a member of the Virginia Tech Corps of Cadets.

2. Virginia Polytechnic Institute and State University (hereinafter referred as "the University" or "Virginia Tech") is a land grant institution, founded and incorporated in 1872 at Blacksburg, Virginia — which is located in Montgomery County.  At all times relevant to this Complaint, the defendant's principal place of business was located within the Commonwealth of Virginia.

3. The Virginia Tech Corps of Cadets (hereinafter referred to as "the Corps of Cadets" or "the Corps") is a Senior Military College, established under 10 U.S.C. § 103, *et seq.* as an educational and training entity serving the United States Department of Defense.  It is one of just six SMC's specifically provided for by the *United States Code*, and one of only two that is hosted by a major public university.  As a Senior Military College, the Corps of Cadets remains separate and distinct from its hosting university, although its founding coincided with the founding of the University in 1872, and the two bodies work closely together in accordance with federal law, Corps policy, and University policy.  At all times relevant to this Complaint, the defendant's principal place of business was located in Blacksburg, within the Commonwealth of Virginia

4.   Upon information and belief, Defendant Timothy Sands, Ph.D (hereinafter referred to as "DEFENDANT SANDS") is a natural person who was, at all times relevant to this Complaint, a citizen of the United States and a resident of the Commonwealth of Virginia. As President of Virginia Tech, DEFENDANT SANDS is responsible for overseeing student disciplinary matters at the University.  At all times relevant to this Complaint, DEFENDANT SANDS was acting under color and authority of Virginia law and University policy.

5.   Upon information and belief, Defendant Frank Shushok, Junior (hereinafter referred to as "DEFENDANT SHUSHOK") is a natural person who was, at all times relevant to this Complaint, a citizen of the United States and a resident of the Commonwealth of Virginia. DEFENDANT SHUSHOK served as Interim Vice President of Student Affairs for Virginia Tech from October 2019 until April 10, 2020 — at which time the "interim" label was removed from his title.  As the Vice President of Student Affairs (an/or Interim Vice President of Student Affairs) DEFENDANT SHUSHOK was delegated responsibility for overseeing Student Conduct policies.   At all times relevant to this Complaint, DEFENDANT SHUSHOK was acting under color and authority of Virginia law and University policy.

6.   Upon information and belief, Defendant Frances B. Keene, Ph.D (hereinafter referred to as "DEFENDANT KEENE") is a natural person who was, at all times relevant to this Complaint, a citizen of the United States and a resident of the Commonwealth of Virginia. As the Assistant Vice President of Student Affairs for Virginia Tech, DEFENDANT KEENE was acting under color and authority of law and University policy at all times relevant to this Complaint.

4

7.  Upon information and belief, Defendant Steve Schuh (hereinafter referred to as "DEFENDANT SCHUH") is a natural person who was, at all times relevant to this Complaint, a citizen of the United States and a resident of the Commonwealth of Virginia. As the Assistant Director of Student Conduct for Virginia Tech, DEFENDANT SCHUH was acting under color and authority of law and University policy at all times relevant to this Complaint.

8.  Upon information and belief, Major General Randal D. Fullhart (ret) (hereinafter referred to as "DEFENDANT FULLHART") is a natural person who was, at all times relevant to this Complaint, a citizen of the United States and a resident of the Commonwealth of Virginia. As Commandant of Cadets for the Virginia Tech Corps of Cadets, DEFENDANT FULLHART serves at the pleasure of the President of the University (i.e., DEFENDANT SANDS) and the Vice President for Student Affairs (i.e., DEFENDANT SHUSHOK).  At all times relevant to this Complaint, DEFENDANT FULLHART was acting under color and authority of Virginia law, and Corps regulations.

9.  Upon information and belief, Colonel Craig Alia (hereinafter referred to as "DEFENDANT ALIA") is a natural person who was, at all times relevant to this Complaint, a citizen of the United States and a resident of the Commonwealth of Virginia.  As Deputy Commandant, 1st Battalion, Virginia Tech Corps of Cadets, DEFENDANT ALIA serves at the pleasure of the President of the University (i.e., DEFENDANT SANDS), the Vice President for Student Affairs (i.e., DEFENDANT SHUSHOK), and the Commandant of Cadets (i.e., DEFENDANT FULLHART).  At all times relevant to this Complaint, DEFENDANT ALIA was acting under color and authority of Virginia law,  and Corps regulations.

10. Upon information and belief, Lieutenant Colonel Donald Russell (hereinafter referred to as "DEFENDANT RUSSELL) is a natural person who was, at all times relevant to this Complaint, a citizen of the United States and a resident of the Commonwealth of Virginia. As Deputy Commandant, 2nd Battalion, Virginia Tech Corps of Cadets, DEFENDANT RUSSELL serves at the pleasure of the President of the University (i.e., DEFENDANT SANDS), the Vice President for Student Affairs (i.e., DEFENDANT SHUSHOK), and the Commandant of Cadets (i.e., DEFENDANT FULLHART).   At all times relevant to this Complaint, DEFENDANT RUSSELL was acting under color and authority of Virginia law, and Corps regulations.

## THE JURISDICTION

11. This is a civil action, commenced under 42 U.S.C. § 1983, seeking damages against the Defendants for committing acts, under color of law, with the intent, and for the purpose of depriving the plaintiff of certain rights secured under the *United States Constitution* and laws of the United States; and for committing additional wrongs against the plaintiff that arise out of a common nucleus of operative facts as the constitutionally-based claims, for which the Defendants are liable pursuant to state law.  Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 2201, 2202, 1331, and 1343.

## THE VENUE

12. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391.  Each act giving rise to the plaintiff's claims occurred in Montgomery County, which is located in this district. Additionally, the University is public institution with its principal place of business located in Blacksburg.  These matters are properly situated, and ought rightly be before this Court.

## **THE NATURE OF THE ACTION**

13. Cadet Rupkey brings his Complaint against Virginia Tech, the Virginia Tech Corps of Cadets, DEFENDANT SANDS, DEFENDANT SHUSHOK, DEFENDANT KEENE, DEFENDANT SCHUH, DEFENDANT FULLHART, DEFENDANT ALIA, and DEFENDANT RUSSELL following multiple violations of his substantive and procedural due process rights.  Along the way, the defendants' acts (and omissions) stripped Cadet Rupkey of equal protection under the law, and, in doing so, deprived him of the most basic, fundamental rights guaranteed to *all* Americans under the 14th Amendment to the United States Constitution.  Cadet Rupkey is also seeking damages under state law, for the defendants' breach of contract and defamation by implication.

14. Virginia Tech is one of only two major public universities currently hosting a Senior Military College under the umbrella of a larger civilian university.  That military college, the Virginia Tech Corps of Cadets, was founded along with the University in 1872.  At that time, participation in the Corps was mandatory for all of Virginia Tech's male students.  The same remained true until 1924, when the requirement for Corps membership was reduced to just two years.  Since 1964, participation in the Corps has been voluntary for all non-ROTC students.

15. In addition to offering a career path for highly-motivated students, the Corps of Cadets provides a "four-year, full-time leader development program focused on building teamwork, character, and problem-solving skills."[1]

---

[1] Source: vtcc.vt.edu

16. Throughout its 148-year history, the Corps has continuously operated on the University's campus and enjoyed a stellar record of extraordinary accomplishments.  During the Spring 2019 semester, cadets had a combined GPA over 3.0 — including more than 700 cadets who were named to the Commandant's List.  Cadets are responsible for more than 12,000 hours of community service each year.  Their alumni have gone on to become leaders in a wide array of fields, including but not limited to: the U.S. Armed Services, government, business, agriculture, medicine, law enforcement, and academics.  Among the Corps' notable alumni, there are seven (7) Medal of Honor recipients.

17. As one of only six (6) Senior Military Colleges in the nation, the Corps must adhere to standards that are similar to those required of the service academies.  In addition to remaining physically fit and taking courses in military training, cadets wear military uniforms.  They are fully immersed in a military training environment all day, every day, throughout the course of their collegiate career — not just during certain hours of the work week.  And, as members of the Corps, they are subject to military discipline.

18. Cadets maintain a structured chain of command that emphasizes mental and physical discipline, character, honor, and tradition.  As with all branches of the military, camaraderie is built and maintained through the experiences that cadets share with one another, and the challenges they overcome as a unit.

19. It is against this backdrop that cadets at Virginia Tech have voluntarily participated in "Integration" for decades.

20. Cadet Integration is a team building event that has been taking place at the University since at the mid-to-late 20th century with the knowledge and support of the Corps' chain of command —including current faculty members.[2]

21. Participation in the event is entirely optional.[3]

22. Every aspect of the event is planned, coordinated, and approved (either expressly or tacitly) by the Corps' leadership.[4]

23. Cadet Integration is entirely consistent with other so-called "Zero Day" activities that take place in military training environments from Fort Benning to Pariss Island, West Point to Annapolis, and VMI to the Citadel.  It is a well-planned, highly-coordinated event that goes to great lengths to ensure the safety of all participants.  It is in no way comparable to the kind of frat-house debauchery that the University's hazing policy was intended to halt.

---

[2] During the University's formal hearing on the matter, DEFENDANT RUSSELL acknowledged that he was familiar with Cadet Integration.  According to DEFENDANT RUSSELL, DEFENDANT FULLHART issues guidance related to Integration each year.  DEFENDANT RUSSELL stated that, during the Fall 2019 semester, DEFENDANT FULLHART had ordered all Integration events to be completed by the end of "Red Phase."

[3] Cadet Rupkey has provided the University with multiple text messages and emails from cadets under his command, requesting leave from Integration because of scheduling conflicts.  In each case, Cadet Rupkey responded by telling the cadets that participation in Integration is optional, and that their absence would be excused without consequence.

[4] Prior to the 2019 Integration, Cadet Rupkey received an Operations Order (i.e., a detailed description of events to be planned and/or executed by members of the Corps) from his student chain of command, and acted in a manner consistent with his belief that the Order had been approved by his *entire* chain of command (i.e., battalion level).  Cadet Rupkey was not involved in any aspect of planning for the event.  As a platoon sergeant, his role was to oversee execution of the the Order in a manner consistent with his commander's intent.  Cadet Rupkey had no reason to believe that his chain of command did not approve of the Operations Order for the 2019 Integration, as the activities described were entirely consistent with past events that he had participated in as a member of the Corps.

24. During the 2019-2020 academic cycle, upperclassmen leaders within the Corps' Bravo Company planned and executed their annual Integration event in a manner that was entirely consistent with the Corps' past Integration events.

25. Bravo Company's 2019 Integration began in the early evening hours of October 18; the entire event was conducted in public at the Caldwell Fields Campground and surrounding area. The event began in partial daylight, and concluded with the aid of flashlights, automobile headlights, and a bonfire.  There were no efforts to disguise or conceal Integration activities from public view.

26. Integration began with a pre-mission safety briefing where cadets were warned of possible hazards and advised that multiple medic stations had been positioned throughout the training course.  Each medic station included at least one trained and equipped medic, standing at the ready to assist injured cadets, if needed.[5]   Water stations were positioned throughout the course in order to ensure proper hydration, and cadets were directed to bring dry, warm sweatshirts to be placed on standby in case weather conditions necessitated their use.  As the sun went down, cadets lit the training course with flashlights and automobile headlights.

---

[5] No cadets were injured during the 2019 Integration event.

27. After the safety briefing, upperclassmen led their sophomore[6] counterparts in a variety of calisthenic exercises.  These body-weight exercises were identical to those performed every day within the military training environment, across each branch of the armed services. Upperclassmen (including Cadet Rupkey, who was a Junior at the time) participated in the exercises alongside their sophomore counterparts while encouraging each member of the group to push himself or herself to their own physical limit.  Water was stationed nearby, and available throughout the exercise.

28. Following calisthenics, upperclassmen directed the sophomores through a short march (sometimes referred to as a "rat line") where cadets placed one hand on the shoulder of the cadet to their front, and used their other hand to cover their own eyes.  This exercise is intended to build trust in one another, while navigating across land with limited visibility. Along the way, the group stopped to perform additional calisthenic exercises, including the so-called "Bravo Baths" that will be discussed with greater detail, herein.  Following this phase of training, cadets were given an opportunity to change into their dry sweatshirts.

29. The next phase of training included a four (4) mile ruck march.  Along the way, cadets encountered various shields that represented different aspects of the unit's history.  The shields were collected and passed between cadets during the march in order to ensure all elements reached the end, together.  Cadets used a lead vehicle and trailing vehicle to guide the march.  The path was lit by headlights, and any cadet who was incapable of completing the march was permitted to get into the trailing vehicle for the remainder of the march.

---

[6] Integration is generally a training/team-building exercise for sophomores.  At the 2019 Integration event, some juniors who had been unable to participate in the prior year's Integration chose to join the exercise.

30. The event culminated with a pinning ceremony.  During the pinning ceremony, each cadet received a unit pin to signify his or her membership within the unit.[7]  During the ceremony, upperclassmen offered stories to highlight the Corps' history and traditions.  This included a discussion of the meaning and symbolism of "blood" pinning.[8]

31. The upperclassmen then informed the sophomores that, if they wanted to participate in blood pinning, they could either (1) pin themselves, or (2) select an upperclassman to perform the act for them.

32. Some cadets chose not to participate in blood pinning — and there was no consequence for that decision.

33. Those who chose to participate in blood pinning later provided written statements to the University, explaining their decision and reasoning, and offering support for the upperclassmen who they had chosen to pin them.

34. At the end of the ceremony, all participants were encouraged to meet up at a local restaurant to celebrate their completion of the event.

35. An anonymous student later complained that Bravo Company's 2019 Integration event constituted hazing.   The accuser erroneously claimed that Bravo's upperclassmen had conducted the Integration event in secret.  In doing so, the anonymous complainant created a false implication that the upperclassmen somehow knew that Integration was wrong.

---

[7] The unit pin is sometimes referred to in witness statements as the "B" pin.  Cadets who choose not to participate in Integration still receive the unit pin.  Integration is not a requirement for pinning and/or membership.

[8] "Blood pinning" occurs when an individual receives his or her rank or unit pin by having another person press the 0.25 inch "stud" of the pin into the recipient's chest, without using the traditional backing to affix the pin to the uniform.  This practice is not intended to injure or demean the recipient.  To the contrary, it is a celebration of the recipient's courage, strength, and accomplishment.  It is intended to honor the cadet in a manner consistent with long-standing military tradition.

36. Virginia Tech and the Corps of Cadets conducted an investigation that was based entirely on the anonymous complainant's misrepresentations.

37. During the course of the investigation(s), University and/or Corps officials interviewed each and every one of the sophomore cadets who had participated in Integration.  None of the cadets corroborated the anonymous accuser's claim that the event had been conducted in secret.  Not a single one of them suggested that his or her own pinning ceremony involved sufficient force to cause pain or discomfort — let alone draw blood or cause an injury.

38. Despite a dearth of evidence to support the anonymous accuser's allegation (and substantial evidence contradicting it), the University and Corps informed Cadet Rupkey that he would be subject to a student conduct hearing, where he would face allegations of "Hazing - Individual Behavior."

39. The distinction between "Hazing - Individual Behavior" and "Hazing - Organizational Behavior" is *not* insignificant.   Under the University's policy, groups that engage in organizational hazing may be subject to discipline — including organizational suspension.[9]

---

[9] Just one semester earlier (i.e., Spring 2019), Virginia Tech suspended eight (8) fraternities for actions that were deemed "organizational" hazing.  Suspended organizations included Alpha Epsilon Pi, Center Club, Delta Kappa Epsilon, Kappa Sigma, Lambda Chi Alpha, Omicron Alpha Kappa, Theta Delta Chi, and Sigma Alpha Epsilon.

40. Under the University's policy, hazing will be considered "organizational" if *any* of the following characteristics exist: (1) The faculty advisor, any executive officer of the organization, or the person charged with the administration of an orientation or pledge program is aware of the incident sufficiently in advance of its occurrence to prohibit its taking place, and takes no action to prohibit it, (2) The faculty advisor, an executive officer of the organization, or the person charged with the administration of an orientation or pledge program knows the identity of the members involved in the incident and refuses to divulge that information, (3) The incident takes place in any public area within a chapter house or in any public place, (4) The incident involves the expenditure of organizational funds, (5) The incident involves or is actively or passively endorsed by a majority of the members of the organization, or (6) The incident involves six or more members of the organization.

41. Cadet Integration is an event that involves literally *dozens* of members of the Corps.  It has taken place for decades with both active or passive endorsements from a majority of the Corps' members.  It takes place *entirely* in public.  Given the long-standing nature of the tradition, it would be impossible for any faculty advisor or officer to reasonably deny knowledge of its existence.  Yet, remarkably, the Corps was able to escape any discipline as an organization because the event was deemed an act of "individual" rather than "organizational" hazing.

42. Ultimately, the University and Corps scheduled Cadet Rupkey's hearing for December 9, 2019.  Cadet Rupkey subsequently learned that his hearing (i.e., the hearing where he would face allegations of *individual* hazing) would to be conducted *jointly* with more than a dozen other cadets who were facing the same allegation.   And, despite the obvious conflict of interest, one of the two hearing officers would be a representative of the Corps, itself  — DEFENDANT RUSSELL.   In effect, the Corps was permitted to investigate itself for an event that would have resulted in its own suspension—were it deemed to be an act of "organizational" hazing.

43. The week before the student conduct hearing, the University and Corps gave Cadet Rupkey a packet of documents (hereinafter referred to as the "investigatory packet") that purportedly contained all of the pertinent information that the investigators had gathered.  ***Exhibit A***

44. The investigatory packet included items that the University and Corps described as (1) a formal notifications of the charges, (2) the investigative report, (3) an addendum to the investigative report, outlining the specific allegations against Cadet Rupkey, (4) witness statements, and (5) a "Pre-hearing Form" outlining the rules and procedures for the student conduct hearing.

45. The packet did not include (1) any statements from the anonymous accuser, or (2) any document, email, or investigator/intake officer notes that referenced the anonymous accuser or the original complaint.

46. This same investigatory packet would later be presented to the hearing officers as a complete record of the investigation, and used as a basis for their findings against Cadet Rupkey his peers.

15

47. The investigatory packet's omissions were not mere oversight by the University; but rather, part of a coordinated effort to conceal the anonymous accuser's identity.  University officials went to the extraordinary length of fabricating an email chain amongst themselves in order to make it appear that the original complaint had come from a senior administrator on November 4, 2019.   In fact, the anonymous accuser had complained directly to the University's Director of Student Conduct nearly two weeks earlier — on October 23, 2019.

48. The University's actions were more than unconscionable.  They intentionally misled the University's own hearing officers (as well as Cadet Rupkey and his peers) about how, when, and from whom the original complaint originated.   Through a well-coordinated and shockingly cocksure campaign of malfeasance, the University stripped Cadet Rupkey of any chance he may have had to form an adequate defense.

49. The student conduct hearing went forward on December 9 with DEFENDANT SCHUH and DEFENDANT RUSSELL serving as hearing officers.  Much like the rest of the investigative process, that hearing was devoid of even the most basic due process safeguards guaranteed to students under the University's student conduct policy (ie., "*The Hokie Handbook*"), the *Corps of Cadets Regulations,* and the Constitutions of both the Commonwealth of Virginia and the United States.

50. On December 12, 2019, the University and Corps notified Cadet Rupkey that he had been found responsible for "Hazing - Individual Behavior" and that, as a result of the finding, he would be suspended from the University for two semesters (among other punishments).

51. The hearing officers' findings were arbitrary and capricious.  They were not supported by the evidence provided in the investigatory packet.  That is to say: No reasonable person could have reached the same conclusion in the absence of overt bias.  In this case, that bias came in the form of an obvious conflict of interest.  By withholding evidence from the accused, and allowing the Corps to investigate itself, the University took an active role in covering systemic failure to protect the Corps of Cadets from organizational suspension.

52. The University corrupted the process by intentionally misleading Cadet Rupkey and failing to provide pertinent information that could have been used to support his defense.  The University had a duty to provide Cadet Rupkey with enough insight into the allegation to place him on notice of the nature and cause of the allegations against him.  Instead, it actively withheld significant facts of the case, and thereby denied him an opportunity to either (1) reasonably confront his accuser or (2) be informed of the specific cause of the allegation against him.

53. Furthermore, the fact that Cadet Rupkey's hearing was inexplicably conducted in a group setting made it impossible for him to either (1) distinguish which specific allegations were being directed at each cadet, or (2) individually confront such allegations.

54. The hearing officers provided a written explanation for their findings.  In it, they emphasized the fact that some cadets had participated in "blood pinning."  The officers noted that the pinning ceremony "would have caused a reasonable person discomfort or pain" — even though none of the cadets interviewed by investigators made that claim, other than the anonymous accuser.

55. In their findings specifically related to Cadet Rupkey, the hearing officers only named one person who they allege Cadet Rupkey blood pinned: Cadet Mitchell Daughtery.  This finding is directly contrary to Cadet Daughtery's own statements to investigators.  Daughtery told investigators that, "the integration night was a fun and rewarding experience for me…At no time did I feel unsafe or that I would be treated differently if had not attended [sic]."  Despite the fact that Cadet Daughtery offered two (2) written statements about the event (neither of which included a claim he had been "blood" pinned by Cadet Rupkey), the hearing officers justified their findings against Rupkey by suggesting that he "…did not provide any refuting information regarding these (blood pinning) allegations."[10]

---

[10] In a statement dated November 4, 2019, Cadet Daughtery states that, "…we had the option to be pinned with the "B" pin.  Before it started, it was clearly stated that this was an optional part of the integration. No one was forced to be pinned, and some people chose not to."  His November 4 statement makes no reference to "blood" pinning, no reference to Cadet Rupkey, and no indication of whether Cadet Daughtery actually participated in *any* form of pinning (i.e., blood pinning, or otherwise).

In a separate statement dated December 6, 2019, Cadet Daughtery clarifies his earlier statement by offering that he "…asked Liam Rupkey on the night of October 18th, 2019, to be pinned with the B pin. When we reached the end of integration, we were each handed a B pin and told that being pinned was absolutely not mandatory multiple times.  I was given the B pin and sought out Liam Rupkey within the group because I wanted him to pin me.  We did not discuss beforehand that he would be pinning me and it was my choice to be pinned by Liam."  Daughtery's statement does not say that he was "blood" pinned by Cadet Rupkey, and it certainly does not allege that Cadet Rupkey caused him any pain or discomfort during the pinning ceremony.

56. The hearing officers' rationale in Cadet Rupkey's case also attributed "planning" for the event to Cadet Rupkey — even though that allegation wasn't supported by a single witness statement or other piece evidence provided in the investigatory packet.   To the contrary, Cadet Rupkey had specifically denied any role in planning the event.

57. The hearing officers' final rationale for the decision highlighted the fact that Cadet Rupkey had engaged in activities that were not expressly described in the Operations Order.   In making this determination, the hearing officers refused to acknowledge the fact that Cadet Rupkey would have had no reason to believe that his actions were not fully endorsed, given that *all* activities performed during Integration had been conducted for decades with the tacit approval of current faculty members who had previously celebrated, rather than condemning such behavior.   This oversight can only be attributed to the officers' obvious conflict of interest.

58. Cadet Rupkey earned a four-year Navy scholarship, and had applied for a highly competitive Marine Corps Scholarship transfer after receiving favorable recommendations from both his Marine Officer Instructor and Professor of Naval Science.   As a result of this disciplinary process, Cadet Rupkey's Navy scholarship is now under review, and his once-promising prospects for a transfer are likely forfeited.   Unless he is afforded the relief requested by this action, Cadet Rupkey will be permanently stigmatized, and his previously stellar record will be forever blemished by a determination of guilt that came as part of a patently unfair procedure, devoid of the most basic due process guarantees.   In addition, having been found guilty of hazing and subsequently suspended, Cadet Rupkey may be forced to dis-enroll from the Corps, forfeit his commission, and repay is scholarship upon graduation.

59. For these reasons and others, Cadet Rupkey respectfully asks this Court to grant declaratory and injunctive relief setting aside the student conduct hearing result as contrary to the United States Constitution, as well as monetary damages to compensate his injuries and punish the flagrant wrongdoing of Virginia Tech, the Corps of Cadets, and their respective officers.

## GENERAL FACTUAL ALLEGATIONS

60. The *United States Code* specifically designates Virginia Tech as one of six institutions of higher learning to host a Senior Military College.

61. The Virginia Tech Corps of Cadets was established, along with the founding of the University in 1872, in accordance 10 U.S.C. § 103, *et seq.*, and has operated continuously ever since.

62.  The purpose of a Senior Military College is to provide an advanced military education and training environment for selected students seeking a commission in the United States Army, Navy, Air Force, or Marine Corps.

63. As part of its mission to educate, train, and prepare cadets for leadership roles in the Armed Forces and/or their community, the Corps conducts a wide range of team-building events that are intended to foster *esprit de corps* among its members.

64. Many of the Corps' team building exercises have been repeated by its cadets for decades.

65. The Corps' faculty leadership encourages cadets to embrace their unit's history and traditions.

66. Faculty support for Corps traditions may be active (i.e., specifically encouraged by the Corps' leadership) or tacit (i.e., celebrated in pictures, displays, and/or other mementos displayed throughout the the Company and/or Battalion area of operation).

## The Corps of Cadets' Integration Events; Generally

67. For decades, members of the Corps of Cadets have engaged in an annual exercise that is led by upperclassmen, intended to build camaraderie with underclassmen, and known generally by the name "Integration."

68. Participation in Integration is voluntary.

69. Integration events generally include a number of physical challenges, wherein upperclassmen lead their sophomore counterparts through activities such as calisthenics, road marches, and team-building exercises.

70. Upperclassmen leaders participate in each exercise alongside the sophomores in order to provide encouragement and push one another to his or her own physical limit.

71.  Such Integration events — particularly those events organized by Bravo Company — have historically culminated in a practice known as "blood pinning."

72. The practice of blood pinning at Integration is a voluntary act; cadets who choose not to be blood pinned suffer no repercussions for that choice.

73. When the Integration event is complete, upperclassmen and underclassmen come together for a cookout or similar celebration to acknowledge their physical accomplishment and *esprit de corps*.

## Blood Pinning; Generally

74. "Blood pinning" is a longstanding military tradition, wherein a rank or unit pin is placed on a service member's upper garment, without the traditional backing, and hit or pressed into the recipient's chest as a means of honoring the individual's courage and achievement by drawing blood without inflicting injury.

21

75. "Blood pinning" is not unique to the Corps of Cadets; it is a longstanding military tradition, practiced throughout the various ROTC and SMC organizations.  Evidence of this decades-old practice can also be found within each branch of the United States Armed Forces.

76. Although "blood pinning" by definition requires the drawing of blood, the Defendants in this matter have continuously and erroneously referred to the tapping of a pin onto the chest of a cadet as "blood pinning" — regardless of whether the act actually caused any pain or injury, or drew blood.

### 2019 Integration Event

77. The exercises, activities, and overall conduct of Bravo Company's 2019 Integration event were entirely consistent past events that have been celebrated in photos prominently displayed by the Corps' leadership in the Company and/or Battalion area of operations as recently as December 2019.  *EXHIBIT B.*

78. Bravo Company's 2019 Integration event took place during the early evening hours of October 18, 2019.

79. The event was entirely optional; no cadet was punished (or threatened with punishment) for his or her failure to attend the event.  To the contrary, Cadet Rupkey specifically excused several cadets who had scheduling conflicts and advised each of those cadets that there would be no consequence for their absence.

80. Commandant staff were aware of the event in advance.

81. The 2019 Integration event was not a secret.  Details of the event were approved by Cadet Battalion Commander Nelson Demarest, and submitted for review and approval at the battalion level.  *EXHIBIT C.*

82. The Operations Order that Cadet Demarest submitted for review and approval was titled "Bravo Company Sophomore Integration," and it specifically noted that cadets would be receiving their pins at the event.  Given the history of "blood pinning" within the Corps, the meaning of this statement would have been understood by any member of the Corps and/or faculty leadership.

83. Cadet Rupkey did not participate in any aspect of planning for the 2019 integration event.

84. Cadet Rupkey received the Operations Order from his student chain of command with the understanding that it had been approved by all levels of the battalion chain of command.

85. As a Platoon Sergeant, Cadet Rupkey was responsible for receiving the Order and conducting mission analysis through use of the Military Decision Making Process (MDMP).

86. The tenants of MDMP require the person conducting mission analysis to go beyond the words on the page, and to fully understand (1) the mission, (2) the commander's intent, (3) the available resources, (4) the constraints and limitations, and (5) all specified and implied tasks.

87. Even though Cadet Rupkey was not present for the planning phase of the operation, he was familiar with concept of operations, the commander's intent, and the implied tasks, having attended similar events in the past.

88. Based on his familiarity with the Integration tradition (and, the Corps leadership's public display of support for past Integration events) Cadet Rupkey had no reason to believe that the expectations for the 2019 Integration were any different than they had been in years past. And, he conducted his mission analysis, accordingly.

89. Approximately forty cadets showed up for Integration at the Caldwell Fields Campground on October 18, 2019.

90. The group was evenly split, with approximately 20 upperclassmen and approximately 20 sophomores.

91. The event was conducted entirely in public; there were no efforts to disguise or conceal Integration activities from the public view.

92. The event began in partial daylight, and concluded with the aid of flashlights, automobile headlights, and a bonfire.

93. Prior to the start of Integration, upperclassmen delivered a pre-mission safety briefing, during which they warned cadets of possible hazards and advised that multiple medic stations had been positioned throughout the training course.

94. Each medic station included at least one trained and equipped medic, ready to assist injured cadets, if needed.[11]

95. As the sun went down, cadets lit the training course with flashlights and automobile headlights.

96. After the safety briefing, upperclassmen led their sophomore counterparts in a variety of calisthenic exercises.

97. Upperclassmen (including Cadet Rupkey, who was a Junior at the time) participated in the exercises alongside their sophomore counterparts while encouraging each member of the group to push himself or herself to their own physical limit.

98. Water was stationed nearby, and available throughout the exercise.

---

[11] No Cadets were injured during the 2019 Integration.

99. Following calisthenics, upperclassmen directed the sophomores through a short march (sometimes referred to as a "rat line") where cadets placed one hand on the shoulder of the cadet to their front, and used their other hand to cover their own eyes.

100. The "rat line" exercise is intended to build trust in one's fellow cadet, while navigating across land with limited visibility.

101. At the conclusion of this phase of training, cadets were given an opportunity to change into dry sweatshirts if they so desired.

102. The next phase of training included a four (4) mile ruck march.

103. A lead vehicle and trailing vehicle were used to guide the march. The path was lit by headlights, and any cadet who was incapable of completing the march was permitted to get into the trailing vehicle for the remainder of the march.

104. At the conclusion of the hike, the group had a celebratory bonfire.

105. During the bonfire, Cadet Rupkey delivered a speech about the history of Bravo Company.

106. Cadet Rupkey's speech included a discussion of the unit's "blood pinning" tradition, along with its meaning and symbolism; however, Cadet Rupkey also assured the sophomores that no cadet would be required to undergo "blood pinning."

107. Following the speech, sophomores received their unit pins; those wishing to participate in a pinning ceremony, did so.

108. Each of the sophomores brought his or her own pin to the ceremony; the pins were cleaned and sterilized prior to the pinning ceremony.

109.  Those who expressed an interest in being "blood" pinned were offered the choice of (1) pinning themselves, or (2) choosing an upperclassman to perform the pinning.

110.  The pins, which had been sterilized with rubbing alcohol, were then lightly tapped onto the sophomores' upper garment, either by the individual cadet or his or her chosen mentor.

111.   No one was required to participate in "blood pinning."   In fact, Virginia Tech's own investigation revealed that several sophomores declined to be pinned, and were not retaliated against, belittled, or made to feel any less a member of the Corps of Cadets or Bravo Company.

112.   None of the cadets who chose to be pinned appeared to suffer, or stated that they had suffered, any injury or pain.

113.   None of the cadets who were pinned reported having blood drawn as a result of the pinning, and no blood was observed on any cadet's clothing following the pinning ceremony.

114.   The pinning ceremony, as conducted during the 2019 Integration event, would not have caused a reasonable person pain or discomfort.

115.   Following the event, most the the participants took pictures together, congratulated one another, and joined together for a celebratory dinner at a nearby "Cook Out" restaurant.

116.  No drugs or alcohol were involved in the 2019 Integration event.

117. The exercises, activities, and overall conduct of Bravo Company's 2019 Integration event were entirely consistent past Integration events; if anything, it was less physically intensive than it had been in prior years.

118. Cadet Rupkey has been greatly damaged by the Defendants' unconscionable attempt to scapegoat him for his good faith effort to honor a Corps' tradition.  His academic future is severely damaged; his opportunity to pursue his chosen career as military officer has been similarly damaged; funds expended in pursuit of his college education are lost; the innumerable sacrifices made by his family so that he could receive the said opportunities have been squandered; and his reputation and good name have been irreparably destroyed.

119. Prior to December 12, 2019, Cadet Rupkey possessed an unblemished record of leadership, scholarship, and community service within both the Corps and University communities.

120. Cadet Rupkey chose to enroll at Virginia Tech specifically because of the opportunities that would be afforded him as a member of the Corps of Cadets.

121. Cadet Rupkey entered into a contract with the United States Navy in order to secure a four-year ROTC scholarship.  Pursuant to that agreement, the U.S. Navy has contributed tens of thousands of dollars toward Cadet Rupkey's education.

122. As of this filing, Cadet Rupkey has completed more than half of the requirements for his graduation and commissioning.  If not for his improper suspension, he would have been on track to graduate following the Spring 2021 semester.  As a result of his suspension, his graduation has been delayed, and his future is now in doubt.

123. During the 2019-2020 academic cycle, Cadet Rupkey was a junior who at Virginia Tech. He made the Dean's List with a 3.50 GPA, and he was a member of the Corps of Cadets in good standing.   Within the Corps, he was assigned to Bravo Company, and held the leadership position of Platoon Sergeant.  Pursuant to that position, Cadet Rupkey's duties included training, leading, and mentoring subordinate cadets.

## The Investigation

124. On October 23, 2019, Ennis McCrery (hereinafter, "Ms. McCrery"), Director of Student Conduct at Virginia Tech, spoke with an anonymous student about the 2019 Integration.  Ms. McCrery took notes during the meeting.

125.  Later the same day, Ms. McCrery emailed DEFENDANT SHUSHOK and DEFENDANT KEENE regarding the meeting.

126.  In her email, Ms. McCrery reported that the anonymous student had asserted that the 2019 Integration was a "secret" initiation; that it was not sanctioned by the Corps of Cadets; that sophomores were threatened not to tell anyone about the event; that the event involved "extremely intense" physical activity; and that the Integration leaders required sophomores to falsely claim that they went to an obstacle course.

127.    Approximately one week later, on November 1, 2019, Ms. McCrery emailed DEFENDANT SHUSHOK and DEFENDANT KEENE again, indicating that she had spoken again with the anonymous accuser.  She provided her notes, containing a more detailed — though, by her own admission, generic — summary of the event and asked to discuss approaching DEFENDANT FULLHART about the situation.  ***Exhibit D.***

128.  The notes purporting to contain the anonymous accuser's statements contained multiple allegations that were inconsistent with subsequent witness statements, cast serious doubt on the credibility of the accuser, and called into question whether the anonymous accuser had even witnessed the event at all.

129.  Many of the anonymous accuser's statements were inconsistent the University and Corps' own findings, including the following:

a.  The anonymous accuser asserted that the 2019 Integration was not sanctioned by the Corps of Cadets' leadership, despite the fact that multiple witnesses, including Cadet Rupkey, had cited an Operations Order for the event and stated that they acted under the belief that it had been approved;

b.  The anonymous accuser asserted that Bravo Company leadership talked about a prior event involving Foxtrot Company's 2018 Integration, which resulted in sanctions against that company and the Corps of Cadets.   No witnesses corroborated this accusation;

c.  The anonymous accuser stated that cadets were forced to wear weighted vests.   No other witness corroborated this accusation;

d.  The anonymous accuser asserted that the water Bravo Company performed physical exercise in was not cold.  Other witnesses alleged that it was cold;

e.  The anonymous accuser asserted that "blood pinning" had occurred, but defined blood pinning as "upperclassmen pound[ing] a company pin into a sophomore's chest," and thus (1) provided a false definition, and (2) mischaracterized the light tapping of pins as "pounding"; and

f.  The anonymous accuser asserted that, after the 2019 Integration, everyone returned to campus, despite the fact that, after the event, the cadets simply went their own separate ways — with a large number of them choosing to gather together for a meal at the nearby Cook Out restaurant.

130. On November 3, 2019, DEFENDANT SHUSHOK emailed Ms. McCrery and DEFENDANT KEENE and suggested that they "pair[] [Ms. McCrery's] narrative down a lot and only share[]" a sanitized version of the complaint that DEFENDANT SHUSHOK had typed up, himself. ***EXHIBIT E.***

131. When DEFENDANT SHUSHOK suggested to Ms. McCrery that they keep the student's identity anonymous, and that DEFENDANT KEENE fabricate an email to obfuscate the source and full scope of the student's accusations, he knew (or should have known) that the Virginia Tech and Corps of Cadets policies provide — and the 14th Amendment to the *United States Constitution* guarantees — that students like Cadet Rupkey have a right to know and confront their accuser in matters of misconduct.

132. DEFENDANT SHUSHOK knew (or should have known) that he was intentionally disregarding Cadet Rupkey's rights as a student accused of misconduct, when he went to great lengths to re-package the original student's complaint and fabricated an email chain to hide its source.

133. Pursuant to DEFENDANT SHUSHOK's suggestion on November 4, 2019, DEFENDANT KEENE emailed DEFENDANT SHUSHOK, to advise him that she had "received a complaint." DEFENDANT KEENE then proceeded to provide the very same sanitized version of the complaint that DEFENDANT SHUSHOK had, himself, drafted. The paired-down version of the complaint omitted any reference to the original accuser, along with many of the details from the original accusation. It even omitted the fact that the original complainant was a student. ***EXHIBIT F.***

134.   DEFENDANT KEENE's email to DEFENDANT SHUSHOK contained multiple false, misleading, and/or disingenuous statements, such as the fact that she had "received a complaint" and that, [g]iven the severity of what [she] learned, [she] wanted to bring it to DEFENDANT SHUSHOK's attention."   In reality, DEFENDANT KEENE was simply providing DEFENDANT SHUSHOK with information he already knew — at his request — in order to disguise the true origin of the allegation.  *EXHIBIT F.*

135.   Approximately one hour later, DEFENDANT SHUSHOK forwarded DEFENDANT KEENE's contrived email to DEFENDANT FULLHART; Ms. McCrery was included on the forwarded email as well.   The stated purpose of forwarding the email was to initiate an investigation into whether the October 18, 2019 Integration constituted hazing.

136.  Virginia Tech and the Corps of Cadets assigned DEFENDANT ALIA and Ms. McCrery to investigate the hazing allegations.

137.  Neither DEFENDANT ALIA nor Ms. McCrery should have been assigned to investigate the matter, due to their obvious conflicts of interest and/or bias.

138.   DEFENDANT ALIA's conflicts of interest were self-evident.   He was one of the two faculty members in charge of the Bravo Company cadets.   He was the senior faculty member that Cadet Rupkey, and other cadets, could and would turn to for counsel or approval of liberties.   As the charged cadets were under his authority, DEFENDANT ALIA held a higher degree of influence over the cadets than any other faculty member on campus.

139.   Furthermore, DEFENDANT ALIA had an additional conflict specifically related to the 2019 Integration because he was a witness to some of the most pertinent facts of the case.

140.  As Deputy Commandant, one of DEFENDANT ALIA's duties was to sign-off on operation orders that students drafted in advance of their team-building events.

141.  Perhaps the most critical question to be answered by the investigation was whether the 2019 Integration was sanctioned (*i.e.,* whether the event's operations order had been approved).

142.  DEFENDANT ALIA would later claim that he never saw or approved the operations order for the 2019 Integration, supporting the highly contested claim that the event was unsanctioned and conducted in secret.

143.  DEFENDANT ALIA had a personal interest in the case; any admission that he was aware of or had approved or sanctioned the 2019 Integration may have resulted in discipline against him by the University or the Corps of Cadets.

144.  Even if DEFENDANT ALIA was not conflicted out of the case by his status as a material witness, it still would have been entirely inappropriate to allow him (or any other member of the Corps of Cadets) to investigate the matter.  Under the University's hazing policy, groups found to have engaged in "organizational" hazing are subject to discipline as an organization. Thus, the Corps should not have been permitted to investigate its own behavior, as it had a clear interest in the outcome of the matter.

145.  Ms. McCrery had a conflict of interest because she was the person to whom the original complaint had been made — a fact which DEFENDANT SHUSHOK and DEFENDANT KEENE conspired to obscure.

146. Ms. McCrery had actually taken at least two (2) separate statements from the anonymous accuser prior to being placed in charge of the University's investigation — a fact omitted from the investigative report that she ultimately authored along with DEFENDANT ALIA.

147. Ms. McCrery's bias was evident in a later email to DEFENDANT SHUSHOK and DEFENDANT KEENE in which she opined that the anonymous accuser "did the right thing" and that they were "pretty special…with a strong moral compass."  Ms. McCrery further stated that she "admire[d]" the accuser and thought him or her worthy of "the Courageous Leadership award." ***EXHIBIT G.***

148.  Ms. McCrery's email praising the anonymous accuser was sent on November 6, 2019, despite the fact that she had started her official investigation just two days earlier, and would not submit a final report on the matter until November 18.  Ms. McCrery had obviously made up her mind regarding the veracity of the anonymous accusers allegations before she had been afford time to conduct even a cursory investigation of the matter.

149.  On November 4, 2019, DEFENDANT ALIA ordered all Bravo Company sophomores and various Bravo Company leaders, including Cadet Rupkey, to report for a mandatory meeting.

150.  Sophomores were taken into a separate room, where they were ordered to make written statements about what happened.  They were told that, if they refused, they would face punishment.  Neither Ms. McCrery nor DEFENDANT ALIA never actually interviewed any of the sophomores.  All interviews were conducted by subordinates who were assigned by Ms. McCrery and DEFENDANT ALIA.

151. Each sophomore present provided a written statement.

152.   Not a single sophomore implicated Cadet Rupkey in behavior that would constitute "hazing" within the University or Corps definition.

153.   Out of 26 written statements provided to investigators, only two contained anything other than praise for the event and Cadet Rupkey's role in it.  The two concerned individuals did not complain of any physical contact or force applied by Cadet Rupkey.  Rather, they were troubled by Cadet Rupkey's use of cursing and "degrading and somewhat punitive words." Other cadets described the same behavior as "running up and down our makeshift formation and encouraging us."

154.   Several sophomores praised Cadet Rupkey and the event, itself:

   a.   "I was very happy, as the whole event boosted morale, and I felt very accomplished…At not point did I feel like I couldn't speak up if something was unsafe or uncomfortable…Overall, it was run professionally and with and concern to the safety for those involved."

   b.   "I asked C/SFC Rupkey if it would be alright if I didn't attend the event. C/SFC Rupkey responded swiftly by explaining that the Sophomore Initiation was entirely up to me if I wanted to participate and was completely optional."

   c.   "I enjoyed the integration event and feel that it was a good bonding experience for us.  Nothing we did was any more intensive than some of the other Corps sanctioned activities."

   d.   "I had a migraine, so I texted Liam Rupkey and asked him if I was fine not attending initiation.  He told me that I was fine not going, and stressed to me that it was a completely optional event just intended to increase camaraderie."

   e.   "I personally enjoyed the event because it brought us together…I do not find it appropriate to describe the event as hazing."

155.   The majority of the sophomores' statements specifically emphasized the fact that both Integration and the pinning ceremony were optional.   The letters had an overwhelmingly positive tone:

    a.   "We began doing some light PT";

    b.   "We had the option to get blood pinned";

    c.   "After that we went to Cook-Out";

    d.   "They stated [pinning] was optional";

    e.   "There were cars and flashlights to see";

    f.   "It was made clear…if we did not want to participate, we did not have to";

    g.   "Bravo initiation was <u>not</u> mandatory, neither was blood pinning.  Leadership made that clear";

    h.   "I was not blood pinned because I refused";

    i.   "It was made VERY CLEAR that the entire event was optional"; and

    j.   "[M]ultiple announcements were made that this event was completely voluntary and if you did not participate, there would be no consequences."

156.   Not a single cadet corroborated the anonymous accuser's suggestion that the event was conducted in "secret" or "unsanctioned."

157.   Not a single cadet indicated that his or her pinning ceremony involved pounding the pin into his or her chest in a manner that would draw blood and/or cause injury.  To the contrary, one cadet offered that he had asked Cadet Rupkey to pin him, but that Cadet Rupkey "didn't push hard enough so it didn't go in so I ended up pushing it into myself." [sic]

158.  On the evening of November 4, 2019, DEFENDANT ALIA sent an email to DEFENDANT FULLHART stating that the interviews were complete.

159.  In an apparent rush to judgment, DEFENDANT ALIA stated that he and Ms. McCrery had a "full understanding" of what had happened at the 2019 Integration, despite admitting that he had not gone over all of the witness statements, and despite not obtaining individual accounts from the student leaders, including Cadet Rupkey.  *EXHIBIT H.*

160.  DEFENDANT ALIA went on to suggest that the details of the investigation, though "imprecise," still corroborated the anonymous accuser's complaint. *EXHIBIT H.*

161.  In reality, many details of the investigation either directly contradicted or failed to corroborate the anonymous accuser's statement; it was riddled with inconsistencies, as previously discussed in paragraph 129, above.

162. On November 5, 2019, before Virginia Tech or the Corps of Cadets held any sort of hearing, DEFENDANT ALIA moved all of the cadets alleged to have participated in the 2019 Integration, including Cadet Rupkey, out of leadership positions, despite his assurances that there would be no rush to judgment.  In doing so, it appears DEFENDANT ALIA attempted to distance himself from the allegations of hazing in Bravo Company.

163.  By November 6, 2019, DEFENDANT ALIA and Ms. McCrery had determined who would be charged, making a critical distinction between those accused of "blood pinning" and those who were not.

164. By November 12, DEFENDANT ALIA further categorized the participants as either leaders, those who had pinned, or those who had otherwise participated.

165. Between November 4 and November 18, DEFENDANT ALIA and Ms. McCrery exchanged a number of emails discussing the findings of their investigation, who would be charged, and other matters related to the 2019 Integration event.  DEFENDANT FULLHART was copied on many of those emails.

166. On November 18, Ms. McCrery and DEFENDANT ALIA finished and submitted their investigation report.

167. The investigation report, which would ultimately be used by the hearing officers as a basis for their findings, contained a number of inaccuracies.

168. Although the report correctly noted that "platoon leaders and platoon sergeants all stated that they believed the event was approved by the Corps of Cadets leadership," it erroneously presumed that the cadets somehow "knew that the 'Bravo Bath'[12] and blood pinning would not have been approved by the Corps of Cadets leadership."

169. This is simply untrue.  Cadet Rupkey believed that his chain of command had approved all aspects of Integration — and he said as much.  The entire event was consistent with his prior experience in the Corps.  Calisthenic exercises in ankle-deep water were so commonplace that faculty members knew the practice by its nickname (i.e., "Bravo Baths").  What's more: the Operations Order specifically noted that cadets would be receiving their pins at Integration.  Based on the Corps' longstanding traditions, any member (including faculty) would have understood this statement to include blood pinning.  Cadet Rupkey had no reason to believe that any aspect of the event lacked support from the Corps' leadership.

---

[12] The term "Bravo Bath" is used colloquially within Bravo Company to denote calisthenic exercises that are performed in ankle-deep water.

170.   The investigation report also failed to acknowledge the extent to which the investigators' findings were inconsistent with the details of the original complaint, including, but not limited to: the complainant's original allegation that cadets were forced to wear weighted vests, the complainant's suggestion that Bravo Company leadership had talked about a prior event involving Foxtrot Company's 2018 Integration; the complainant's erroneous description of everyone returning to campus after the event; and the complainant's debunked description of the water as "not cold."   At this point, it remains unclear whether the anonymous accuser even witnessed the event at all.

171.   On November 20, 2019 — before Virginia Tech had even conducted a hearing on the matter — DEFENDANT ALIA indicated that Ms. McCrery had stated "that all punishments from student affairs would not go into effect until next semester," suggesting that Virginia Tech had already determined that punishment would include suspension and other serious sanctions.

172.   On November 25, Ms. McCrery sent Cadet Rupkey a letter advising that he had been charged with certain violations of the University's hazing policy.

173.   That letter informed Cadet Rupkey that, "In determining whether a specific behavior violates the hazing policy, consideration will be given to how the behavior relates to the University's mission and purpose.  Please refer to the Hazing Section in the Hokie Handbook for additional information."

174. The *Hokie Handbook, 2019-2020* (hereinafter referred to as the "*Hokie Handbook*") defines hazing as "any mental or physical requirement, request, or obligation placed upon any person which could cause discomfort, pain, fright, disgrace, or injury, is personally degrading or violates any federal, state, or local statute, or university policy, the willingness of an individual to participate in such activity notwithstanding." ***EXHIBIT I.***

175. The *Hokie Handbook* incorporates by reference the *Virginia Tech Corps of Cadets Regulations, July 2019* (hereinafter referred to as "*the Corps of Cadets Manual*").

176. Annex B of the Corps of Cadets Manual described specific acts that constitute hazing. Pinning a cadet, whether blood is drawn or otherwise, is not defined as hazing, nor mentioned anywhere in the *Hokie Handbook* or *Corps of Cadets Manual*.

177. On December 2, 2019, Ms. McCrery and DEFENDANT ALIA met with Cadet Rupkey and the other accused students for a pre-hearing meeting.

178. Ms. McCrery and DEFENDANT ALIA gave the accused students a packet of documents (hereinafter referred to as "the investigatory packet") purporting to contain all of the evidence that was pertinent to the investigation.

179. The investigatory packet did not include any meeting notes with the anonymous accuser, or any email, document, or other item of evidence that the accuser had submitted to the University to initiate the investigation.

180. The investigatory packet contained the final investigation report authored by DEFENDANT ALIA and Ms. McCrery, which the cadets, including Cadet Rupkey, saw for the first time — two weeks after it had been completed.

181.   The final investigation report read as follows:

On November 4, 2019, Interim Vice President of Student Affairs Dr. Frank Shushok received a report from Interim Assistant Vice President of Student Affairs Dr. Frances Keene alleging that students in Bravo Company held a secret, unsanctioned 'sophomore integration event' on or about October 18, 2019. Specifically, the report states the following:

*Around 6:00 p.m., Bravo Company departed by car to the event and were warned not to tell anyone. Sophomores were instructed not to write "integration" when they signed out and to record different destinations so as not to draw attention to the fact that a large group was leaving together.*

*As part of the "integration" (lasting around 4 hours) cadets went to Caldwell Fields where they:*
*1) were required to do pushups and sit ups in the parking lot*
*2) led in "rat line" to a creek to take "Bravo Baths" in the creek 3) Alternated bear crawls, crab walks, and other exercises back to the parking lot*
*4) Climbed a mountain and were instructed to bear crawl, crab walk, with pushups in between*
*5) Given weighted vests and instructed to run up and down for several miles*
*6) "Blood pinned" by upperclassmen (i.e., upperclassmen pounded a company pin into a sophomore's chest)*

Dr. Shushok referred this report to Major General Randy Fullhart, Commandant of the Corps of Cadets, and Ennis McCrery, Director of Student Conduct, for a joint investigation.

182.   As written, the final investigation report gave the impression that the italicized text directly quoted the original complainant.   As noted above, it did not.   Rather, DEFENDANT SHUSHOK had drafted that section, himself, on November 3, 2019, based entirely on secondhand information that he'd drawn from Ms. McCrery's generic notes from a meeting that had taken place ten days earlier.   Dr. Shushok then sent the statement to DEFENDANT KEENE, along with a directive that she send it back to him on November 4, 2019 in order to "start" the investigation.

183.  As a result, the final report misled the University's own hearing officers by creating a false implication that the italicized portion of the complaint came from a person with actual knowledge of the event

184. As written, the final report would have also misled the hearing officers into believing that an unbiased, fair, and thorough investigation had been conducted.

185.  Virginia Tech knowingly misled its own hearing officers about the true source, substance, and nature of the hazing complaint in the final report to the parties.  Virginia Tech further misled its own hearing officers regarding the underlying motivations of the investigators, the lack of impartiality on the part of the investigators, the rushed, inadequate investigation, the failure of the investigators to explore the discrepancies between the statement of the complainant and the statements of the participants, and the predispositions of the investigators to hold the cadets responsible and impose harsh sanctions in order to send a clear message to the community regarding Virginia Tech's ostensible intolerance of hazing.

186.  The packet also contained written statements and an official notification that the joint student conduct hearing was set for December 9, 2019, at 8:00 a.m.

187. Cadet Rupkey thus had less than one week to prepare a defense to the serious, yet vague and generalized charges against him.

188.  The joint student conduct hearing set for December 9, 2019, also coincided with end of semester activities, such as exams and deadlines for reports, as classes ended on December 11, 2019, and final exams were administered between December 13 and December 18, 2019.

189.  In light of these facts, Cadet Rupkey, requested a continuance for the hearing.

190.  That request was denied.

191.   Ultimately, the joint investigation by Virginia Tech and the Corps of Cadets failed to proceed in accordance with University policies, as outlined in the *Hokie Handbook* and the *Corps of Cadets Manual*.   Likewise, the joint investigation failed to proceed in a manner consistent with the due process and equal protections guarantees of the 14th Amendment to the *United States Constitution.*

192.  The Hokie Handbook incorporated by reference the Corps of Cadets Manual and set forth the procedure for alleged violations by cadets of university policies:

> *Alleged conduct violations by cadets of university policies and/or Corps of Cadets regulations are adjudicated either by the Cadet Executive Committee or a Deputy Commandant hearing.*

> *…Cadet regulations stipulate the detailed process of adjudicating alleged cadet misconduct.*

193.  The applicable "cadet regulations" referenced in the *Hokie Handbook* are set forth under a section entitled "rights of the accused" in the *Corps of Cadets Manual*.  They include, among other things:

> *2.  Be informed of the identity of the accuser(s) or the circumstances leading to the hearing…*

> *8.  Cross-examine witnesses who are provided for in accordance with this regulation…*

> *10.  Have evidence, including documents or physical evidence within the control of the Corps of Cadets or University authorities produced in accordance with this regulation.*

194.   Consistent with these rights, on November 4, 2019, Cadet Rupkey signed a document provided to him by Virginia Tech, labeled "Accused Rights," which stated in part:

>   *2. You shall be informed of the identity of the accuser(s) or the circumstances leading to the hearing.*

>   *3. You shall be informed of witnesses and provided copies of any statements or other evidence used against you.*

195.   Virginia Tech and the Corps of Cadets failed to uphold Cadet Rupkey's rights as set forth in their own policies.

196.   Virginia Tech and the Corps of Cadets failed to inform Cadet Rupkey of the identity of his accuser.

197.   Virginia Tech and the Corps of Cadets failed to inform Cadet Rupkey of the circumstances leading to his hearing.

198.   Virginia Tech and the Corps of Cadets failed to allow Cadet Rupkey the opportunity to cross-examine his accuser.

199.   Virginia Tech and the Corps of Cadets failed to give Cadet Rupkey all of the documents and evidence within its control prior to the hearing.

<u>**The Hearing**</u>

200.   On December 9, 2019, Cadet Rupkey and the other accused students appeared for a joint hearing, administered by Virginia Tech and the Corps of Cadets, to determine whether they had violated the hazing policy.

201.   On the eve of the hearing, DEFENDANT ALIA contacted one of the accused students by email and advised him how to plead the next day. He said to accept responsibility, stay focused on the "big picture," and "we can work around anything else."

202.  DEFENDANT ALIA did not refer the student to an independent advisor for advice on how to plead the next day at the hearing.

203.   The hearing officers consisted of one member from the Virginia Tech Office of Student Conduct, and one member from the Corps of Cadets' faculty leadership.

204.  The hearing officer from the Office of Student Conduct was DEFENDANT SCHUH.

205.  The hearing officer from the Corps of Cadets was DEFENDANT RUSSELL.

206.   DEFENDANT RUSSELL was not a neutral decisionmaker; as a member of the Corps of Cadets faculty leadership, he had an interest in finding individuals such as Cadet Rupkey responsible for individual acts of hazing, rather than risk having the Corps of Cadets face discipline as an organization.

207.  The hearing officers advised the students that they had the right to plead responsible, not responsible, or no plea, to the charges.

208.  A pre-hearing communication from Virginia Tech informed the students, including Cadet Rupkey, that their plea had no bearing on the outcome of the hearing.

209.   The accused students, including Cadet Rupkey, each entered their pleas; Cadet Rupkey entered a plea of not responsible.

210.   After taking pleas, the hearing officers heard opening statements from each of the accused students.

211.  Next, the hearing officers reviewed the contents of the investigators' report and the various written statements from the sophomores who were present at the event.

212.   The hearing officers then heard testimony from the accused students, including Cadet Rupkey.

44

213.  The hearing officers did not hear testimony from anyone identified as the original accuser because, as noted above, the original accuser was never identified.

214.  During the hearing Ms. McCrery knowingly lied to the hearing officers when she stated that "this began on November 4, 2019," when DEFENDANT SHUSHOK contacted her.

215.  In truth, Ms. McCrery was approached by the original, anonymous complainant on October 23, 2019, a fact which, at a minimum, DEFENDANT SHUSHOK and DEFENDANT KEENE were aware of. Yet, Ms. McCrery's false statement was apparently accepted during the hearing, and Ms. McCrery was never reprimanded for making a false statement during a formal hearing.

216.  Then, during a break in the hearing, DEFENDANT ALIA suggested to one of the cadets that he should change his plea to responsible. DEFENDANT ALIA, however, did not offer this advice to Cadet Rupkey or, upon information and belief, any other cadet.

217.  Following the hearing, on December 12, 2019, Cadet Rupkey and others were found responsible for violating the Virginia Tech's hazing policy. ***EXHIBIT J.***

218.  The letter that Cadet Rupkey received on December 12, 2019, first defined "blood pinning" as "putting a pin onto an individual's chest and then physically hitting or pushing the exposed pins into the individual's skin to the point of drawing blood." It then explained that the hearing officers had found Cadet Rupkey responsible for "blood pinning."

219.  This finding is not supported by evidence; no sophomore in Bravo Company who was pinned stated that blood was drawn as a result of the pinning, nor did any cadet report that they felt any pain or were injured from any pinning ceremony conducted by Cadet Rupkey.

220.  Even DEFENDANT FULLHART admitted that no sophomore in Bravo Company who was pinned was injured from the pinning. *EXHIBIT K.*

221.  None of the sophomores who were interviewed suggested that the event was hazing; no one was hurt, injured, or endangered; the event itself was a Corps of Cadets tradition; and, there was no evidence, other than alleged statements from the anonymous accuser, that the event was held in secret to evade detection from university authorities.

222.  Therefore, the evidence did not support a finding of hazing.

223.  As punishment for the finding of responsibility, Virginia Tech suspended Cadet Rupkey for two semesters, and Cadet Rupkey was dismissed from the Corps of Cadets and barred from re-enrolling for two semesters.  He also forfeited his Emerging Leader Scholarship.

224.  Cadet Rupkey was not punished with a deferred suspension, as other cadets were, specifically because he was found to have "blood pinned" a cadet.

225.  The student who DEFENDANT ALIA advised to accept responsibility prior to the hearing received a lesser sanction, even though he was found guilty of having "blood pinned" a cadet, specifically because of his "acceptance of responsibility and reflection," despite the fact that Cadet Rupkey and the other accused students were assured that their plea would have no bearing on the outcome.

226.  Cadet Rupkey, as well as the other accused students, were advised that they had a right to appeal on the following grounds: (1) denial of procedural guarantees; (2) significant and relevant new evidence that was not available at the time of the hearing; and (3) sanctions/ findings that are unduly harsh or arbitrary.

**The Appeal**

227.  Pursuant to his rights, Cadet Rupkey appealed the hearing outcome to both Virginia Tech and the Corps of Cadets.

228.  DEFENDANT KEENE presided over the appeal for Virginia Tech; she was appointed by DEFENDANT SHUSHOK, who held administrative authority and responsibility for Student Conduct policies and procedures, in order to "expedite" the appeals.

229.  DEFENDANT KEENE was not a neutral decisionmaker; she had overt biases and a conflict of interest.

230.  Specifically, DEFENDANT KEENE was involved in the investigation of the 2019 integration event from the beginning, and even conspired with DEFENDANT SHUSHOK to create a false narrative regarding the origination of the complaint.

231.  Further, DEFENDANT KEENE was regularly updated by DEFENDANT ALIA and Ms. McCrery—who, as noted above, had conflicts of interest and were biased themselves—on the investigation, likely causing DEFENDANT KEENE to form pre-conceived notions regarding the allegations against Cadet Rupkey, among others.

232.  In addition, DEFENDANT SHUSHOK, who appointed DEFENDANT KEENE and was ultimately responsible for Student Conduct policies and procedures, had a clear bias in favor of the anonymous complainant and against the other cadets in the Corps of Cadets, including Cadet Rupkey.

233.   In an email dated November 7, 2019, to the anonymous complainant, Dr. Shushok noted that he "admire[d] and respect[ed]" the anonymous complainant, stated that he felt "inspire[d]" by the anonymous complainant, drew parallels between his own experiences and the anonymous complainant's to bolster the connection between them, and offered his help and support to the anonymous complainant, signing the email, "Your fan." **EXHIBIT L.**

234.   DEFENDANT FULLHART presided over the appeal for the Corps of Cadets.

235.   Like DEFENDANT KEENE, DEFENDANT FULLHART was not a neutral decisionmaker; he, too, had overt biases and a conflict of interest.

236.   DEFENDANT FULLHART was regularly updated by DEFENDANT ALIA and Ms. McCrery—who, as noted above, had conflicts of interest and were biased themselves—on the investigation, and was involved in the investigation against the cadets of Bravo Company, including Cadet Rupkey, from the outset, likely causing DEFENDANT FULLHART to form pre-conceived notions regarding the allegations against Cadet Rupkey, among others.

237.   Additionally, pursuant to Virginia Tech policy, as enumerated in the Hokie Handbook:

> *A hazing incident may also be organizational activity if any of the following is true:*
>
> *1.  The faculty advisor, or any of the executive officers of the organization, or the person charged with the administration of an orientation or pledge program is aware of the incident sufficiently in advance of its occurrence to prohibit its taking place, and takes no action to prohibit it*
>
> *3.  The incident takes place in any public area within a charter house or public place*
>
> *5.  The incident involves or is actively or passively endorsed by a majority of the members of the organization.*
>
> *6.  The incident involves six or more members of the organization.*

238.  As previously discussed, DEFENDANT FULLHART (as well as other executive officers of the Corps of Cadets) were aware or should have been aware of the 2019 integration event; the 2019 integration event was held in a public place; the 2019 integration event was well known throughout the Corps of Cadets as a longstanding tradition; and the 2019 integration event involved approximately 40 cadets.

239. DEFENDANT FULLHART was overtly biased because any finding or admission that he was aware of or had approved or sanctioned the 2019 Integration would or should have resulted in a finding of organizational hazing, which would have likely resulted in discipline against DEFENDANT FULLHART by Virginia Tech, or the loss of his position as Commandant of Cadets — especially in light of past similar incidents involving the Corps of Cadets.  Accordingly, DEFENDANT FULLHART had an improper motive and pecuniary interest in finding individuals such as Cadet Rupkey responsible for the 2019 Integration as opposed to the Corps of Cadets as an organization.

240.  Taking additional time to consider the appeals (a courtesy not extended to Cadet Rupkey upon his request for a continuance prior to the initial hearing) DEFENDANT KEENE waited until January 10, 2020 to deny Cadet Rupkey's appeal;  DEFENDANT FULLART denied Cadet Rupkey's appeal the next day.

## The Damage

241.   Cadet Rupkey has been greatly damaged by the Defendants' unconscionable attempt to scapegoat him for his good faith effort to honor a Corps tradition: His academic future is severely damaged; his opportunity to pursue his chosen career as military officer has been similarly damaged; funds expended in pursuit of his college education are lost; the innumerable sacrifices made by his family so that he could receive the said opportunities have been squandered; and his reputation and good name have been irreparably destroyed.

242. Cadet Rupkey entered into a contract with the United States Navy in order to secure a four-year ROTC scholarship.  Pursuant to that agreement, the U.S. Navy has contributed tens of thousands of dollars toward Cadet Rupkey's education.  As of this filing, Cadet Rupkey has completed more than half of the requirements for his graduation and commissioning.  If not for his improper suspension, he would have been on track to graduate following the Spring 2021 semester.  As a result of his suspension, his graduation has been delayed, and his future is now in doubt.  Unless he is afford the relief requested by this action, Cadet Rupkey will be forever stigmatized, and his previously stellar record will be forever blemished, by the Defendant's actions.

243.   Additionally, because Cadet Rupkey has been found responsible for hazing, he will be subject to a Navy review (which is currently pending), which could force him to disenroll, forfeit his commission, and repay his scholarship upon graduation.

## COUNT I
## AGAINST ALL DEFENDANTS

### Violation of the Due Process Clause of the Fourteenth Amendment, Pursuant to 42 U.S.C. §  1983 - Procedural Due Process

244.  Cadet Rupkey repeats and realleges each and every one of the foregoing allegations as if fully set forth, herein.

245.  The Fourteenth Amendment to the United States Constitution provides: "No State…shall… deprive any person of life, liberty, or property without due process of law."

246.  Pursuant to 42 U.S.C. § 1983: "Every person who, under color and authority of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

247.  At the time that Cadet Rupkey attended Virginia Tech, the University had in place a system of expelling, suspending, or dismissing students, only after a finding of cause, in accordance with its policies and procedures in the *Hokie Handbook*.

248. Specifically, the *Hokie Handbook* provides that students such as Cadet Rupkey are entitled

to procedural guarantees, including the following:

   a. The student or organization will be provided with a written statement of charges sufficiently in advance of the hearing and in reasonable detail to allow the student or organization to prepare a case for the formal hearing;

   b. Students may choose to refute or question any information or witnesses and will be given an opportunity to present a rebuttal to the charges and to produce witnesses or written statements on their own behalf;

   c. To help them prepare their response, students or organizational representatives may choose an advisor, who may be present at the formal hearing but may not participate in the proceedings;

   d. At a formal hearing, the student or organizational representative may challenge the objectivity of any committee member or administrator, given reasonable cause to believe that the member may be biased or have a conflict of interest;

   e. When the outcome of a formal hearing results in suspension, dismissal or denial of athletic privileges/ housing/network access, the charged student or organization may appeal; and

   f. Sanctions do not typically take effect until the Appellate Officer decision is final.

249. The *Hokie Handbook* identifies a formal student conduct hearing as a right.

250. The *Hokie Handbook* provides: "Behaviors that violate the Student Code of Conduct are addressed through the student conduct system. Beyond the rights and responsibilities outlined in this handbook, Virginia Tech students enjoy those rights guaranteed by the Constitutions of the United States and of the Commonwealth of Virginia."

251. The *Hokie Handbook* provides: "Policies are valid for the period given. The university reserves the right to change those policies during the academic year and notification is hereby given of that possibility."

252.  At no time relevant to this Complaint did Virginia Tech change its policies regarding the student conduct system.

253.  Thus, Virginia Tech, through the specific policies and procedures set forth in its *Hokie Handbook*, created a reasonable expectation that Cadet Rupkey would not be removed from the university or deprived of his right to pursue his degree but for application of the system that Virginia Tech had enacted in student conduct matters.

254.  Accordingly, Cadet Rupkey had a property interest in his continued enrollment at Virginia Tech.

255.  Cadet Rupkey also had a property interest in his continued eligibility for the Emerging Leader Scholarship, the U.S. Navy's contributions to his education which he may now be required to repay, and his officer contract with the U.S. Navy.

256.  Cadet Rupkey suffered a deprivation of his property interests when he was suspended for two semesters from Virginia Tech and dismissed from the Corps of Cadets, which, as a result, will inhibit his ability keep his officer contract with the U.S. Navy and scholarship.

257.  Cadet Rupkey also has a constitutionally protected liberty interest in his good name, reputation, and integrity.

258.  Cadet Rupkey suffered a deprivation of his liberty interest when he was found responsible for hazing and consequently suspended for two semesters from Virginia Tech and dismissed from the Corps of Cadets, which, as a result, will inhibit his ability keep his officer contract with the U.S. Navy and scholarship, and may result in the forfeiting his commission, constituting the loss of government employment.

259.  The due process protections of the 14th Amendment to the *United States Constitution* apply to the disciplinary process used by Virginia Tech and the Corps of Cadets against Cadet Rupkey.

260.  Cadet Rupkey was entitled to process commensurate with the seriousness of the charge of hazing and the potential discipline he faced. The allegation was serious and resulted in harsh sanctions, as well as the prospect of a lifelong stigma that will foreclose future educational and employment opportunities.

261.  Cadet Rupkey was entitled to a fundamentally fair procedure to determine whether he was responsible for the alleged misconduct.

262.  Defendants failed to provide adequate procedural due process when they:

    a.  fabricated an email chain to obfuscate the nature, substance, and identity of his accuser;

    b.  failed to identify Cadet Rupkey's accuser;

    c.  failed to provide Cadet Rupkey with an opportunity to confront and question his accuser, thereby precluding Cadet Rupkey from soliciting any evidence regarding the anonymous complainant's actual knowledge, credibility, biases, conflicts of interest, and other relevant facts;

    d.  failed to provide Cadet Rupkey all the evidence in their possession, including the original complaint, meeting notes, and other items, before the formal hearing;

    e. appointed investigators, hearing officers, and appellate officers to adjudicate Cadet Rupkey's charges who were not impartial as they possessed known biases and/or conflicts of interest;

    f. failed to provide Cadet Rupkey with a adequate notice of the charges again him;

263.  DEFENDANT SHUSHOK intentionally violated Cadet Rupkey's procedural due process

rights in that he conspired to obfuscate the origins of the allegations against Cadet Rupkey

and his fellow accused students, for the purpose of preventing Cadet Rupkey from knowing

the identity and cross-examining the anonymous complainant. This act had the effect of

precluding Cadet Rupkey from soliciting favorable testimony regarding the anonymous

complainant's knowledge (or lack thereof), credibility, biases, conflicts of interest, and other

relevant facts. DEFENDANT SHUSHOK thus intentionally disregarded Cadet Rupkey's

rights as a student accused of misconduct.

264. DEFENDANT KEENE intentionally violated Cadet Rupkey's procedural due process rights

in the same vein as DEFENDANT SHUSHOK. Additionally, DEFENDANT KEENE

intentionally violated Cadet Rupkey's procedural due process rights in adjudicating Cadet

Rupkey's appeal and upholding the sanctions imposed against him, when:

a.  Cadet Rupkey lacked the opportunity to confront and question his accuser,
thereby precluding Cadet Rupkey from soliciting any evidence regarding the
anonymous complainant's knowledge, credibility, biases, conflicts of interest, and
other relevant facts

b.  The investigation report which formed the basis for the allegations against
Cadet Rupkey was compiled by investigators with known biases and conflicts of
interest;

c.  Cadet Rupkey did not have all the evidence in Virginia Tech and the Corps of
Cadets' possession, including the original complaint, meeting notes, and other
items, before the formal hearing and appeal;

d.  Cadet Rupkey was not provided with adequate notice of the charges again him;
and

e. DEFENDANT KEENE was not an impartial decisionmaker, for the reasons
previously stated, herein.

265.   Because DEFENDANT SHUSHOK had administrative authority and responsibility for

Student Conduct policies and procedures, and because DEFENDANT SHUSHOK appointed

DEFENDANT KEENE to adjudicate Cadet Rupkey's appeal, DEFENDANT SHUSHOK is

responsible for DEFENDANT KEENE's procedural due process violations.

266.   DEFENDANT SCHUH intentionally violated Cadet Rupkey's procedural due process

rights in finding Cadet Rupkey responsible and imposing sanctions against him, when:

a. Cadet Rupkey lacked the opportunity to confront and question his accuser,
thereby precluding Cadet Rupkey from soliciting any evidence regarding the
anonymous complainant's knowledge, credibility, biases, conflicts of interest, and
other relevant facts;

b. The investigation report which formed the basis for the allegations against
Cadet Rupkey was compiled by investigators with known biases and conflicts of
interest;

c. Cadet Rupkey did not have all the evidence in Virginia Tech and the Corps of
Cadets' possession, including the original complaint, meeting notes, and other
items, before the formal hearing and appeal; and

d. Cadet Rupkey was not provided with adequate notice of the charges again him;

267.   DEFENDANT RUSSELL intentionally violated Cadet Rupkey's procedural due process

rights in finding Cadet Rupkey responsible and imposing sanctions against him, when:

a. Cadet Rupkey lacked the opportunity to confront and question his accuser,
thereby precluding Cadet Rupkey from soliciting any evidence regarding the
anonymous complainant's knowledge, credibility, biases, conflicts of interest, and
other relevant facts

b. The investigation report which formed the basis for the allegations against
Cadet Rupkey was compiled by investigators with known biases and conflicts of
interest;

c. Cadet Rupkey did not have all the evidence in Virginia Tech and the Corps of
Cadets' possession, including the original complaint, meeting notes, and other
items, before the formal hearing and appeal;

d. Cadet Rupkey was not provided with adequate notice of the charges again him; and

e. DEFENDANT RUSSELL was not an impartial decisionmaker, for the reasons previously stated, herein.

268. DEFENDANT FULLHART intentionally violated Cadet Rupkey's procedural due process rights in finding Cadet Rupkey responsible and imposing sanctions against him, when:

a. Cadet Rupkey lacked the opportunity to confront and question his accuser, thereby precluding Cadet Rupkey from soliciting any evidence regarding the anonymous complainant's knowledge, credibility, biases, conflicts of interest, and other relevant facts

b. The investigation report which formed the basis for the allegations against Cadet Rupkey was compiled by investigators with known biases and conflicts of interest;

c. Cadet Rupkey did not have all the evidence in Virginia Tech and the Corps of Cadets' possession, including the original complaint, meeting notes, and other items, before the formal hearing and appeal;

d. Cadet Rupkey was not provided with adequate notice of the charges again him; and

e. DEFENDANT FULLHART was not an impartial decisionmaker, for the reasons previously stated, herein.

269. As a result of these due process violations, Cadet Rupkey was wrongly disciplined and suffers ongoing harm to his good name and educational progress. He has incurred attorneys' fees, lost his Virginia Tech Emerging Leaders scholarship, and is at jeopardy of losing his commission and incurring a repayment debt of his scholarship. Furthermore, as a consequence of Defendants' actions, Cadet Rupkey's military career is in jeopardy, and his chances for promotions and positions within the military will be adversely affected.

## COUNT II
## AGAINST ALL DEFENDANTS

### Violation of the Due Process Clause of the Fourteenth Amendment, Pursuant to 42 U.S.C. § 1983 - Substantive Due Process

270.  Cadet Rupkey repeats and realleges each and every one of the foregoing allegations as if fully set forth, herein.

271.  The Fourteenth Amendment to the United States Constitution provides: "No State…shall… deprive any person of life, liberty, or property without due process of law."

272.  Pursuant to 42 U.S.C. § 1983: "Every person who, under color and authority of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

273.  Separate and apart from the fairness of the procedures utilized, the 14th Amendment to the *United States Constitution* also protects Cadet Rupkey's property interests under substantive due process from government intrusion which is arbitrary and capricious.

274.   Virginia Tech has a long history of permitting students in the Corps of Cadets to conduct integration events that include physical training exercises and optional pinning. Indeed, there was even a photograph hanging in the Corps of Cadets hall documenting such an event the previous year. ***EXHIBIT B.***

275.   In November 2019, Virginia Tech received notice from counsel for an accused student of hazing in other companies. But, Virginia Tech declined to investigate or bring sanctions against anyone else, other than Cadet Rupkey and the members of Bravo Company.

276.   In October 2018, Virginia Tech responded to severe hazing conduct in Foxtrot Company by imposing sanctions far less serious than those imposed against Cadet Rupkey and the other accused students in Bravo Company.   No Foxtrot Company students were suspended; at most, they received deferred suspensions.

277.   In October 2017, six student leaders in the Corps of Cadets' Hotel Company were found responsible for hazing new cadets with physical exercises, but Virginia Tech did not even investigate this incident, let alone impose sanctions.   The sophomore students participating in the 2019 Integration event suffered injuries no more severe than those suffered by the sophomores the 2017 incident.

278.   The failure to investigate other allegations and willingness to impose less severe sanctions for more severe conduct demonstrates that the Defendants were not interested in holding accountable everyone who engaged in such an acts equally, but rather in casting blame on a few cadets to answer a specific complaint.

279.  Most importantly, no one, other than the anonymous, unnamed, unidentified complainant, seems to have suggested that Cadet Rupkey and his peers committed an act of hazing during the 2019 Integration. The overwhelming weight of evidence suggests that the event was safe, voluntary, and optional.

280.  The Defendants found Cadet Rupkey responsible for hazing because he purportedly "blood pinned" another cadet, which was defined by Virginia Tech and the Corps of Cadets as "putting a pin onto an individual's chest and then physically hitting or pushing the exposed pins into the individual's skin to the point of drawing blood."

281.  Significantly, there was no evidence whatsoever that any sophomore participating in the 2019 integration event had their blood drawn as a result of the pinning performed upon them, and certainly not by any pinning performed by Cadet Rupkey.

282.  Accordingly, it was arbitrary and capricious for Defendants to punish Cadet Rupkey for hazing, when the facts do not support it, the same conduct had been tolerated in the past, and other conduct has gone entirely uninvestigated.

283.  As a result of these due process violations, Cadet Rupkey was wrongly disciplined and suffers ongoing harm to his good name and educational progress. He has incurred attorneys' fees, lost his Virginia Tech Emerging Leaders scholarship, and is at jeopardy of losing his commission and incurring a repayment debt of his scholarship. Furthermore, as a consequence of Defendants' actions, Cadet Rupkey's military career is in jeopardy, and his chances for promotions and positions within the military will be adversely affected.

## COUNT III
## AGAINST ALL DEFENDANTS

## <u>Violation of the Equal Protection Clause of the Fourteenth Amendment,<br>Pursuant to 42 U.S.C. § 1983</u>

284. Cadet Rupkey repeats and realleges each and every one of the foregoing allegations as if fully set forth, herein.

285. The Fourteenth Amendment to the United States Constitution provides: "No State…shall…deprive any person of life, liberty, or property without due process of law."

286. Pursuant to 42 U.S.C. § 1983: "Every person who, under color and authority of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

287. Under the 14th Amendment to the *United States Constitution*, all persons similarly situated must be treated alike. Thus, if a class of persons similarly situated to another class have been treated disparately, the 14th Amendment has been violated.

288. Cadet Rupkey and the other accused students in Bravo Company were in all relevant respects similarly situated to the cadets in Foxtrot Company who were charged with hazing due to an incident that occurred within Foxtrot Company in 2018.

61

289.   However, Cadet Rupkey and the other accused students in Bravo Company were treated disparately compared to Virginia Tech's treatment of the Foxtrot Company cadets.

290.   Specifically, Virginia Tech imposed sanctions far less serious than those imposed against Cadet Rupkey and the other accused students in Bravo Company, for conduct that was objectively more severe than the conduct alleged to have been committed by Cadet Rupkey and the other accused students in Bravo Company. No Foxtrot Company students were suspended; at most, they received deferred suspensions.

291.   As a result of this violation of the Equal Protection Clause, Cadet Rupkey suffers ongoing harm to his good name and educational progress. He has incurred attorneys' fees, lost his Virginia Tech Emerging Leaders scholarship, and is at jeopardy of losing his commission and incurring a repayment debt of his scholarship.  Furthermore, as a consequence of Defendants' actions, Cadet Rupkey's military career is in jeopardy, and his chances for promotions and positions within the military will be adversely affected.

**COUNT IV**
**AGAINST DEFENDANT VIRGINIA TECH,**
**DEFENDANT VIRGINIA TECH CORPS OF CADETS,**
**AND**
**DEFENDANT FULLHART**

**<u>Defamation by Implication</u>**

292. Cadet Rupkey repeats and realleges each and every one of the foregoing allegations as if fully set forth, herein.

293. On January 23, 2020, DEFENDANT FULLHART, working as an agent of the University and Corps, conducted a lecture — addressing the entire Corps of Cadets — on the topic of hazing.

294. During the lecture, DEFENDANT FULLHART spoke in detail of the 2019 Integration event.  He began, in relevant part, by reminding the cadets that "there were cadets here last semester that are no longer here, now."

295. During his description of the 2019 Integration, DEFENDANT FULLHART told the cadets that, "Blood pinnings were a part of the experience.  We'll talk more about that in a moment."

296. But, before continuing his discussion of blood pinning, DEFENDANT FULLHART transitioned into a description of the voluntary nature of the 2019 Integration.  In doing so, he made statements that he knew or should have known to be false: "In the course of the discussion between all those who were participating, you know, it was 'made clear' [finger quote gesture] that this was optional — that you don't have to do it.  'We'll think the same of you whether you do it or not.'  But, some people suggested otherwise.  And, certainly, some of the people who were involved on the receiving end thought otherwise."

297. At the time that DEFENDANT FULLHART made these statements, he knew or (based on his own investigation) should have known that it was inaccurate to suggest that "some of the people who were involved on the receiving end thought [that the event was not voluntary.]" He also knew, or should have known, that he was speaking with reckless disregard for the truth when he stated that "some people suggested [that the event was not voluntary.]"

298. In fact, DEFENDANT FULLHART knew or should have known that not a single witness had suggested that Integration was anything other than voluntary.  Many of the cadets flat-out refuted that suggestion — including several who reported that they had chosen not to participate and that they were not punished or mistreated as a result.  The only person who suggested that the event was not voluntary was the anonymous accuser.  Thus, even if the accuser were to be believed, DEFENDANT FULLHART would have known that a single, anonymous accuser does not constitute "some people."

299. The only reasonable purpose for DEFENDANT FULLHART's knowingly false statement would be to create an implication in the minds of his audience that the 2019 Integration event amounted to one group of aggressors attacking another group of unwilling cadets.

300. After falsely implying that multiple participants in the 2019 Integration did not believe the event was voluntary, DEFENDANT FULLHART immediately returned to the discussion of blood pinning, and continued his lecture as follows: "So let me talk about blood pinning.  For those of you who don't know, blood pinning in the context of the military: If we go back decades, there were practices where, in certain organizations or after certain training when events were successfully completed, there was a ceremony including where they took the pin that you normally wear on your uniform and they'd slap it on you to the point that it would

go through your uniform, maybe into your skin.  There was blood involved.  That's where the term blood pinning comes from.  I know when I was first starting out as an Air Force officer, there was a practice of "tapping on" your rank.   So, especially if you were an enlisted member and you got to sew on rank, they'd maybe say, 'Congratulations!   You've been promoted from tech sergeant to master sergeant.'   A couple people would come up to you with a piece of tape and they'd put the rank over the old rank.  And then, they'd all count to three and just slam the crap out of you [punching gesture].  I can show you a video from the United States Navy from 2014, where it showed, that practice on a Navy ship, and what happened to the individuals who were involved in it, and the person who allowed it to happen to them.  Imagine being hit so many times by your peers that you can't get your arms over your shoulders because of the damage."

301. At the time that DEFENDANT FULLHART made these statements, he knew or should have known that he was creating, in the minds of his audience, an implication that the 2019 Integration pinning ceremony was conducted in a manner similar to the extreme events that he was describing.

302. Based on his own investigation, DEFENDANT FULLHART knew that the 2019 Integration pinning ceremony was *not* conducted in a manner that was substantially similar to the events he was describing.  Further, he knew that the 2019 ceremony was not conducted in a manner that could have resulted in the kind of extreme injuries he was describing.  ***EXHIBIT K.***

303. By (1) reminding his cadets that some of last year's cadets were no longer with them,  (2) creating a false impression that there were multiple unwilling participants in the 2019 Cadet Integration, and (3) immediately following with extreme examples of blood pinning, DEFENDANT FULLHART knew or should have known that he was creating, in the minds of his audience, an implication that the suspended cadets had violently attacked unwilling sophomores in a manner consistent with the events he was describing.

304. These statements, when taken together and in the context of the lecture as a whole, did in fact create the inference, implication, and/or insinuation that Cadet Rupkey and the other suspended cadets had violently attacked unwilling sophomores in a manner consistent with the other events DEFENDANT FULLHART had described.

305. Individual cadets who heard DEFENDANT FULLHART's lecture understood his words to mean that Cadet Rupkey and the suspended cadets had violently attacked unwilling sophomores.

306. The implication created by DEFENDANT FULLHART's statements was false.

307. Falsely accusing a person of an act of violence is defamatory, *per se*.

308. As a direct and proximate result of the above conduct, Cadet Rupkey has sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries, reputational damages, and other direct and consequential damages.

309. As a result of the foregoing facts, Mr. Jackson is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT V
## AGAINST VIRGINIA TECH

### Breach of Contract

310.  Cadet Rupkey repeats and realleges each and every one of the foregoing allegations as if fully set forth, herein.

311.  Cadet Rupkey provided Virginia Tech with sums of money for his education.  In return, Virginia Tech contracted to provide Cadet Rupkey with access to its degree program.

312. Cadet Rupkey's enrollment in, and attendance of, classes at Virginia Tech created an expectation that he would be allowed to continue his course of study until he earned his degree from Virginia Tech, provided that he maintained satisfactory grades and complied with Virginia Tech's rules and policies.

313.   Accordingly, as a condition of Cadet Rupkey's enrollment at Virginia Tech, an express contractual relationship existed between Virginia Tech and Cadet Rupkey, under which each party owed the other certain duties in the *Hokie Handbook* and the *Corps of Cadets Manual.*

314.  Virginia Tech had a duty not to suspend Cadet Rupkey for violations of the University's conduct policy without affording him the "rights of the accused" set forth in the *Corps of Cadets Manual.*

315.  Virginia Tech breached its duty under the *Corps of Cadets Manual* when it failed to inform him of the identity of his accuser, failed allow him to cross-exam his accuser, and failed to provide all of the evidence in its possession prior to suspending him for is role in the 2019 Integration.

316.    As a result of Virginia Tech's breach of contract, Cadet Rupkey suffered damages, including disruption of his educational progress; embarrassment; and, loss of good name.

## PRAYER FOR RELIEF

FOR THE FOREGOING REASONS,  Cadet Rupkey respectfully seeks judgment against the Defendants (jointly and severally) as follows:

a.  A declaratory judgment that the Defendants have violated Cadet Rupkey's constitutionally-guaranteed right to due process;

b.  A preliminary injunction, requiring the Defendants to set aside any finding of misconduct against Cadet Rupkey, and to reverse any disciplinary action or punishment (including suspension) which may have been enacted against Cadet Rupkey as a result of this process;

c.  A permanent injunction, requiring the Defendants to expunge any record that is or ever has been maintained by the University or the Corps (or created by any agent thereof) which gives any indication that Cadet Rupkey participated in an act of hazing or was disciplined for his role in any of the events described herein;

d.  A permanent injunction, enjoining the Defendants from taking any further disciplinary and/or punitive action against Cadet Rupkey for his role in any of the events described herein;

e.  A permanent injunction, enjoying the Defendants from creating or maintaining any further record (including any transcript notations) which commemorates Cadet Rupkey's role in any of the events described herein or the disciplinary process which followed;

f.  A permanent injunction, enjoining the defendants from disclosing any detail of the events described herein (including the fact that disciplinary action was taken against Cadet Rupkey) to any third party;

g.  An award of Cadet Rupkey's attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and any other authority;

h.  An award of compensatory damages in an amount to be determined at trial against Defendants Frank Shushock, Junior, Frances B. Keene, Ph.D, Steve Schuh, MG Randal Fullhart (ret), COL Craig Alia, and LTC Donald G. Russell in their respective individual capacities;

i.  An award of punitive damages in an amount to be determined at trial against Defendants Frank Shushock, Junior, Frances B. Keene, Ph.D, Steve Shuh, MG Randal Fullhart (ret), COL Craig Alia, and LTC Donald G. Russell in their respective individual capacities; and

j.  Such other and further relief as the Court may deem just, equitable, and proper.

## JURY DEMAND

Cadet Rupkey demands a trial by jury of all triable issues in the present matter.

**DATED:**    **Roanoke, Virginia**
              **July 8, 2020**

Respectfully submitted,

**LIAM J. RUPKEY**

by:    /S/ Joshua Farmer

Joshua Farmer, VSB #87508
*Counsel for the Plaintiff, herein*

Joshua Farmer, Esquire (VSB #87508)
*Counsel for the Plaintiff, herein*

FARMER LEGAL PLLC
5030 Sadler Place, Suite 205
Glen Allen, Virginia 23060
Phone: 804. 325. 1441
Fax: 804. 510. 0224
E-mail: josh@farmerlegalhelp.com